**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **1. KATHY CHAVEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. ______________** |
| | ) | |
| **1. US DEPARTMENT OF DEFENSE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, Kathy Chavez, and for her causes of action herein alleges and states as follows.

## <u>PARTIES</u>

1. Plaintiff, Kathy Chavez at all times herein was a citizen of the State of Oklahoma and employed fulltime in the position of Inventory Management Specialist (Customer Support Specialist) at the Defendant Department of Defense's Defense Logistics Agency (DLA) at Tinker Air Force Base, Midwest City, Oklahoma.

2. Defendant Department of Defense employed the Plaintiff at the Defense Logistics Agency (DLA) at Tinker Air Force Base, Midwest City, Oklahoma.

## <u>VENUE</u>

3. All acts and omissions herein occurred within Oklahoma County, State of Oklahoma.

## JURISDICTION

4. Heretofore on October 26, 2023, the Plaintiff was wrongfully removed from her position of employment at the Defense Logistics Agency (DLA) at Tinker Air Force Base, Midwest City, Oklahoma.

5. The Plaintiff timely appealed that wrongful removal to the US Merit Systems Protection Board (Docket No. DA-0752-24-0092-I-1). Pursuant to legal authority of 5 U.S.C. §7511-§7513. The Plaintiff's appeal was based on unlawful discrimination against her because of gender (female), sexual orientation, and physical disability, and on unlawful workplace retaliation and harassment after the Plaintiff reported a workplace mishap. A hearing was conducted by the MSPB with Administrative Judge Chizoma A. Ihekere presiding. On October 2, 2026 the Initial Decision rendered by that AJ became final to affirm the removal action by the Agency.

6. Plaintiff appeals that decision to this honorable Court pursuant to legal authority of 5 U.S.C. §7703 and *Perry v. Merit Systems Protection Board*, 582 US 420 (2017).

## SUMMARY OF PLAINTIFF'S CLAIMS

7. The record herein shows Plaintiff has documented evidence over an extraordinary lengthy period of time wherein Defendant agents and representatives exercised unlawful discrimination against the Plaintiff and harassment and retaliation against her. The discrimination was based on gender (female), sexual orientation, and physical disability. The record shows the Plaintiff sought contemporaneous

administrative relief. And the record shows the Plaintiff was successful in some measure at the administrative level. Yet the Agency discrimination, harassment and retaliation continued.

**FIRST SUSPENSION OF PLAINTIFF**

8. On March 29, 2013, Plaintiff was given a two-day suspension for absence without leave (AWOL) and failure to request leave in accordance with established procedures. That two-day suspension was later set aside and the Plaintiff was reimbursed for the two-days in question.

**FIRST FAD IN DLAR-12-0064.**

9. The Agency issued its Final Agency Decision (FAD) in Agency Case No. DLAR-12-0064. The Agency found the Plaintiff was subjected to a hostile work environment and made detailed findings therein. Agency ordered supervision to move K. Gaston

**SECOND SUSPENSION OF PLAINTIFF**

10. On July 31, 2014 Plaintiff was suspended again for a period not to exceed three-days for Unauthorized Absence and Failure to Request Leave in Accordance with Established Standards.

**PLAINTIFF SEEKS COUNSELING**

11.. On June 25, 2015 Plaintiff established a counseling relationship with Carlos F. Woodward, Sr., Ph.D., LPC, LADC/MH. Dr. Woodward diagnosed Plaintiff with State of Emotional Shock and Stress and Adjustment Disorder with Mixed Anxiety

and Depressed Mood. Plaintiff sought counseling from Dr. Woodward 2015-2022 for trauma suffered from her job. Plaintiff continued counseling upon the death of her 17-year-old son Kolby Dutton who was killed by a DUI driver on May 19, 2022. From December 2022 to present, Plaintiff sought help for her mental health from a psychiatrist who had to prescribe medications for her mental health issues. In May 2023, actions from the retaliation from supervision caused excessive damage to Plaintiff's mental health she was admitted to an Outpatient Mental Health Program. In July, 2023, Plaintiff had to seek mental health care to an inpatient mental health program for 5 days from the trauma Plaintiff was being subjected to at the hands of supervision and K. Gaston. Plaintiff was due to return to work after her mental health medical treatment when supervision informed Plaintiff that she was still expected to come into work and physically work at her desk across the aisle from K. Gaston's desk.

12. From August 2023 to present, Plaintiff sought mental health therapy with a new therapist via Telehealth due to the development of agoraphobia from mental decline on top of the trauma and stress already suffered by Plaintiff.

13. Supervisor E. Crawford was given a hard copy of diagnosis by the Plaintiff that he put into her employee file located in his desk. E. Crawford ignored the diagnosis and the Plaintiff's pleas for help. No curative action was taken from any level of supervision despite the diagnosis from Dr. Woodard.

**PLAINTIFF FILES FORMAL COMPLAINT OF DISCRIMINATION DLAR-15-0253 (SECOND COMPLAINT)**

14. On August 13, 2015 Plaintiff filed a Formal Complaint of Discrimination regarding the conduct of Mr. Upton and her discomfort around him.

15. On or around June 5, 2015 Plaintiff informed supervision (her first- and second-line supervisors, respectively) that during staff meeting on May 27, 2015 her team leader, directed a "licking gesture" at her to denigrate the Plaintiff's sexual orientation. He then told the Plaintiff to give up on the PRIDE group because it was not looked upon highly by supervision.

16. Supervisor E. Crawford was on leave when Plaintiff no longer felt safe or comfortable approaching Pat Upton regarding the licking gesture. On June 16, 2015, Plaintiff sent an email to supervisors Edward Crawford and Doug Williams requesting they take appropriate action regarding Upton's behavior of June 10, 2015 as the Plaintiff "no longer felt comfortable talking to him about the licking gesture." Plaintiff formally reported the sexual harassment to E. Crawford and asked him to move Pat Upton for the sexual harassment towards her. E. Crawford counseled Pat Upton regarding the sexual harassment. Upton came out of E. Crawford's office, and violently sat at his desk and with anger and aggression said, "I guess I have to watch what I say now otherwise I will get into trouble." Pat Upton's creation of sexual harassment and hostile work environment was again reported to E. Crawford after his "I'm going to get in trouble." On June 6th, a day after the June 5th licking gesture, the Plaintiff's CSS team leader became aggressive toward coworkers in the office regarding the music that was

playing on the radio. CCS team leader began to play bag pipe music loudly Plaintiff approached her lead to ask him to stop playing the music loudly, he turned the music up louder. Plaintiff went into supervisors' office to report his behavior. Supervision came into the office, shut down his bag pipe music, supervision turned the radio off and stuck it in a drawer and the office was no longer allowed to have a radio playing in the background. Plaintiff asked E. Crawford to move him not only based on the sexual harassment but also hostile work environment. E. Crawford told Plaintiff that Pat Upton was going nowhere and that her report along was not evidence enough that would constitute a formal investigation, and he was allowed to stay in the office with Plaintiff further exposing the Plaintiff to her sexual harasser and a tormentor adding to the trauma Plaintiff was suffering. Plaintiff had a meeting with E. Crawford, Carl Eggleston, and Mr. Kennedy, where she had to divulge private information, that she had sexual trauma from her past and that Pat Upton's sexual harassment was exacerbating the past sexual trauma she had suffered from. Plaintiff asked again for Pat Upton to please be moved, it was denied. August 13, 2015, Plaintiff started the EEOC process for the sexual harassment from Pat Upton. After the EEO Complaint had been submitted, Plaintiff's supervisor requested a meeting with Plaintiff. Supervision told Plaintiff that her complaint alone could not justify a full review and needed to have others in the office give a statement reporting the sexual harassment. Plaintiff witnessed Pat Upton consistently verbally sexually harass K. Gaston and C. King on a daily basis. When Plaintiff asked them for a statement for the EEO she had filed, they said they

were afraid to file a complaint because it would be filed on supervisor E. Crawford and not Pat Upton. They did not want to experience the stigma of filing a complaint nor did they want to get E. Crawford into trouble because they both like him a lot. Plaintiff was desperate to get Pat out of the office, that she humbly and vulnerably approached K. Gaston and C. King to submit a statement to only supervision regarding the sexual harassment they were subjected to by Pat Upton. Plaintiff had to promise them that it would be submitted only to supervision and not used in the EEO. K. Gaston and C. King also wanted relief from Pat Upton's harassment, they eventually agreed to submit their statements to supervision. Soon after, supervision moved Pat Upton to a new office with new supervision, but, the EEO process was already submitted and awaiting a ruling. EEOC Oklahoma City Judge Michelle Robertson presided over the complaint sent in for the EEOC for a ruling. The Plaintiff was labeled Case No. DLAR-15-0253. The ruling was in favor of the Agency; the ruling had no effect on Plaintiff because supervision had already moved Mr. Upton to another location.

17. The process of Plaintiff having to fight for herself against the sexual harassment, discrimination, harassment, and hostile work environment, only traumatized her further forcing her to seek counseling.

**THE AJ ERRONEOUSLY RULED PLAINTIFF DID NOT PROVE HER CLAIM OF DISCRIMINATION**

18. Heretofore the Plaintiff was employed by the Defendant as a Inventory Management Specialist (Customer Support Specialist) at the Agency's Defense

Logistics Agency (DLA) Aviation Fuels at Tinker Air Force Base, Midwest City, Oklahoma. She served as Customer Support Specialist (CSS) to mitigate back orders and resolve contracts that had not yet been fulfilled. Plaintiff worked in the same office performing workplace tasks for 13 years.

19. On April 13, 2012 the Plaintiff filed a Complaint with the Equal Employment Opportunity Commission (EEOC). Plaintiff's Complaint was docketed as Agency Case No. DLAR-12-0064. The Plaintiff's Complaint involved discrimination and harassment over a two-year span of time based on sex (female), sexual orientation, and physical disability (left index finger).

20. Evidence showed Plaintiff made several allegations to support her claim of discrimination and harassment. She claimed that harassment occurred when: 1) Ms. Chavez believes management harassed her after her late ex-husband (DLA employee) announced in July 2010 to the workforce that she was in a relationship with a female coworker. 2)During the winter of 2010 she received a reprimand for spending too much time in the shops and not enough time at her desk. 3) In July 2010 the complainant's supervisor denied her request to adjust her work hours to report to work one-hour later for child care needs but approved a male coworker's request to adjust his shift to allow him to ride to work with his wife. 4) In June 2011 Ms. Chavez received a performance appraisal which she disagreed with and subsequently she never received an appraisal for that period of time. 5) In early 2011 the complainant was re-assigned to the 2210 building; then later in March 2011 she was notified in an email that she would be reassigned back to her original area but she would no longer be responsible for working with the shop where the female coworker which she was said to have been in a relationship worked. This shop was previously within Ms. Chavez's area of responsibility. 6) In May 2011 the complainant experienced a problem with child care and requested to adjust her shift for approximately 3 months. She was then notified that

she would be permanently moved. She did not concur with the decision. 7) From June 2011 to July 2012 she was verbally badgered and harassed by a co-worker who made comments that she was going to hell and that her children would become gay. The complainant requested assistance from management but she believes the situation was not addressed. 8) In June 2011, the complainant and K. Gaston agreed to divide up the workload leaving Ms. Dutton to work with the shop where the female co-worker she was said to have been in a relationship worked. Her supervisor did not approve and assigned the shop to a new less experienced employee. Ms. Dutton later received a reprimand for providing assistance to her coworker with one of the shops. 9) In January 2012 the complainant filed a grievance regarding being moved to building 9001. She contends because of seniority she should not have been moved. She alleges after several back-and-forth negotiations the move was cancelled. 10) The complaint states in January 2012 during the time frame of the union grievance she requested to view her personnel file. She states she was given several excuses including the file was lost before she was allowed to view her personnel file. 11) In June 2011, Complainant and K. Gaston agreed to divide up the workload, leaving Complainant to work in the shop where complainants same sex partner worked. Supervisor did not approve of the new work load assignments and assigned complainants same sex partner shop, to a new, less-experienced coworker. The new employee was struggling to perform his duties and asked Complainant to help him supervision told her no. Plaintiff was not allowed to help an overwhelmed new coworker manage his caseload. Plaintiff faced resistance and antagonism from supervision when she tried to help train a new coworker, was verbally remanded for it.

21. Complainant and K. Gaston were able to find a temporary solution for disagreements, but no permanent resolution was reached. The torment continued.

22. On June 28, 2018 the EEOC issued a Decision and Order Entering Judgment on Case No. DLAR-15-0253 and granted Summary Judgment in favor of the

Agency and against the Plaintiff. The Plaintiff did not appeal that ruling only because TAFB belatedly transferred Mr. Upton to another location at TAFB under a different supervisor.

23. On June 5, 2019 the Department of Defense Consolidated Adjudication Facility (CAF) made a preliminary decision to deny and revoke Plaintiff's eligibility for access to classified information for duties designated national security sensitive. On June 25, 2019 DLA suspended Plaintiff's access to classified and sensitive information pending a review of the allegation and final clearance determination by CAF. The Plaintiff appealed that action. The Plaintiff voluntarily took curative action to pay off debt and make overdue accounts current. But CAF did not reverse that action on their own. When the Plaintiff's appeal came on for hearing the Judge ruled CAF should have already dismissed the action based on evidence presented, showing a path forward to clear the debt. The Judge ruled in favor of the Plaintiff.

**PLAINTIFF'S EEOC APPEAL DLAR-12-0064 WAS UPHELD**

24. On January 29, 2021 the EEOC Office of Federal Operation issued its decision in DLA Case No. DLAR-12-0064 and found that the Plaintiff "established by a preponderance of the evidence that she was subjected to hostile work environment based on the basis of sex." The Agency was found liable for Supervisor Harassment and Coworker Harassment. Therefore the EEOC reversed the DLA's FAD and remanded that it issued compensatory damages to the Agency for supplemental investigation and ordered 8 different paragraphs of remedial action for the Agency to undertake. March 11, 2021 the Agency appealed the EEOC/OFO ruling in favor of Plaintiff. June 9, 2021 the EEOC/OFO upheld to their ruling in favor of Plaintiff finding

DLA responsible the 2nd time for the harassment, etc. EEOC/OFO ruled that Plaintiff established all elements of her claim that she was subjected to a hostile work environment on the basis of sex for a year when CW2 intentionally made repeated offensive comments about Plaintiff's sexual orientation to her, and despite Plaintiff's complaint of K. Gaston's behavior, her supervisors took no meaningful action to stop the harassment. Plaintiff established that she was subjected to harassment on the basis of sex due to the rumors that were spread around the facility about her sexual orientation and about her relationship with Kay Ford. Plaintiff established that the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating and intimidating, hostile, or offensive work environment. Plaintiff established that her supervisors intentionally subjected her to sex-based harassment, and that "many of her supervisors' actions were based on their knowledge of the rumors that Plaintiff was gay and was having a relationship with Kay Ford." Plaintiff established that her supervisors took employment actions against her based on the "rumors and concerns" they heard about Plaintiff's sexual orientation. Plaintiff demonstrated that the explanation offered by Plaintiff's supervisor as to why she could not adjust her work

25. Plaintiff demonstrated that neither Plaintiff nor Kay Ford ever acted unprofessionally, nor that their rumored relationship affected either of their job performance. Indeed, Plaintiff's performance ratings were nothing other than "Fully Successful," the highest rating possible. Plaintiff established that the Agency is liable for coworker harassment because supervisors were aware that K. Gaston was harassing Plaintiff and making offensive remarks about her sexual orientation as early as August 2011, but did not act effectively when he did not separate Plaintiff and K. Gaston immediately after he learned of the harassment, that Eddie Crawford failed to conduct an investigation into the claims of harassment, and that the harassment continued after Eddie Crawford was notified it was occurring. The lack of any assistance for relief from supervision, Plaintiff desperately sought peace in her office, Plaintiff had to

approach K. Gaston subserviently and vulnerable in order to ask her if they could just agree to disagree regarding social status, religion, politics and abortion, K. Gaston agreed. The 2012 statement the "she and I were getting along now" was true at the time but that truce did not last. K. Gaston's torment continued past the 2012 statement. The diagnosis report from Dr. Woodard in 2015, 2019 and 2022 is proof that K. Gaston did in fact continue her torment. Especially when Dr. Woodard named K. Gaston as a factor in his diagnosis. Plaintiff established that since as early as July, 2010, almost all supervisors and coworkers knew of the rumors, but no supervisory official took any action to stop the rumors once the rumors were brought to their attention. Indeed. "Evidence in the record shows that supervisors also engaged in spreading the rumors," demonstrating their actual intent to create a sexually hostile work environment, and resulting in the Agency's liability for coworker harassment. Plaintiff established that the supervisors' intentional and knowing harassment resulted in tangible employment actions and that the Agency is liable for the supervisors' harassment. Plaintiff established that, when taken together, management's incidents constitute a hostile work environment in violation of Title VII.

**EEOC MODIFIED AGENCY CURATIVE STEPS TO 1-4**

26. On June 9, 2021 the EEOC issued its decision after the Agency appealed Jan 2021 ruling. The EEOC modified its prior decision regarding DLA Case No. DLAR-12-0064 and still ordered the Agency to undertake remedial action in steps 1 through 4.

**AGENCY CURATIVE STEPS WERE UNDERTAKEN**

27. On July 7, 2021 Agency issued its findings and results regarding investigation into the behavior regarding Plaintiff's managers, supervisors and coworkers. Certain management officials received verbal counseling.

28. On January 31, 2022 DLA issued a FAD awarding damages to the Plaintiff pursuant to the EEOC's reconsideration decision. (The restoration of leave with a monetary award to cover the loss of pay); The award regarding leave was due to EEOC finding that K. Gaston did indeed harass Plaintiff and to get away from her she took excessive leave- that she was written up for.

29. DLA found that the Plaintiff was entitled to $20,935.99 for the 799.41 hours of leave without pay (LWOP) for which she was not paid (covering the period of January 1, 2011 and December 21, 2019) $3,513.98 for medical treatment; restoration of 100 hours of sick leave; and $13,500.00 for non-pecuniary damages.

## PERSONNEL SECURITY APPEALS BOARD RESTORED PLAINTIFF'S ELIGIBILITY TO ACCESS CLASSIFIED INFORMATION

30. In June 2021 the Personnel Security Appeals Board overturned the revocation of the Plaintiff's eligibility for access to classified information of a national security sensitive position. As a result of that decision Plaintiff was returned to duty. On June 5, 2019 the Department of Defense Consolidated Adjudication Facility (CAF) made a preliminary decision to deny and revoke Plaintiff's eligibility for access to classified information for duties designated national security sensitive. Plaintiff appealed the revocation of her security clearance. The loss of Plaintiff's security clearance was a very embarrassing event in her life and wanted to limit the number of people that were told especially K. Gaston. Plaintiff told supervision that she would be subjected to more torment when K. Gaston would see her sitting at her desk, not

working while they were forced to perform Plaintiff's duties. Plaintiff informed supervision that she would harass her trying to find out the reasons why she was having to handle part of Plaintiff's workload and just wanted to avoid it completely. Plaintiff agreed to move to Building 3707 to perform duties needed. The move was very productive and healing for Plaintiff because she no longer was subject to the torment from K. Gaston therefore, she was thriving and very happy in her new environment. Plaintiff would email her supervision when she arrived at work and when she left every day while located in this location. Supervision forces another move for Plaintiff. On October 25, 2019, Ms. Cole informed Plaintiff that she was to return to Building3907 because her workspace in Building 3707 was given to a new employee for that office and there would no longer be a spot in 3707. Plaintiff spoke to the supervisor for 3707 about the issue not having a spot for her. He agreed that she could stay there due to Plaintiff was not taking up space or a desk for the new employee. Plaintiff let Mrs. Cole know that the supervisor in 3707 said Plaintiff could stay in the building and that there was "another option," other than returning her to 3907. Plaintiff's security clearance was still suspended and she was unable to perform her duties when supervision forced her to move back into the hostile workplace. Plaintiff feared that K. Gaston would torment her further when K. Gaston would see her at her desk playing on the computer or watching videos on her phone that it would be upsetting to K. Gaston. Plaintiff expressed and reported to Mrs. Cole the fear of having to be in such a harmful environment vulnerable to further trauma. Mrs. Cole disregarded and ignored

Plaintiff's concerns when Ms. Cole sent Plaintiff another email confirming that she was to return to 3907 on November 12, 2019, where she would be forced to work with Gaston. She expressed to Mrs. Cole that she was not comfortable returning to Plaintiff's prior workspace, where she would be subject to questions and comments about why Plaintiff was unable to perform her usual job--particularly from Kathy Gaston, who was the "Know it all" in her office. The requirement that Plaintiff transfer back felt punitive, particularly since Plaintiff had already informed Mrs. Cole of her issues working with Kathy Gaston. Sitting among Plaintiff's coworkers and not being unable to perform her job tasks was one of the most uncomfortable things she ever had to endure. Plaintiff would be again forced to work with Kathy Gaston. Plaintiff felt she had to share the personal information regarding her security clearance loss to explain why they each inherited some of Plaintiff's workload. Plaintiff told them it was just as hard for her to sit there not doing anything while they completed her job duties.

31. Naturally, almost immediately after Plaintiff's return to 3907, Kathy Gaston continued with her workplace torment. Although Plaintiff has no written proof of any ongoing homophobic remarks toward Plaintiff, Plaintiff does have an email exchange with her wife recounting an episode where K. Gaston's verbal displays of politics, religion and abortion were used to say that President Trump "was sent by God" made her cubicle neighbor, Rebecca Laughlin uncomfortable and she left the moment Gaston verbalized her stance on God and President Trump. In January of 2020, Ms. Gaston reported to Mitchell Card that she was working on an" arts and crafts" project

at Plaintiffs desk, using a soldering iron, and that this was a health and safety hazard. Ms. Gaston's report was malicious and it was untrue. Plaintiff brought a variety of things to work to occupy her time, one day it was a wood burning tool for woodwork. Ms. Gaston's statement about "health and safety" was pure pretext, because she knew better. Ms. Gaston knew that soldering irons were used in all the maintenance shops in our building and did not pose a health or safety hazard. K. Gaston she is a former a mechanic for Tinker in her early years before she became a CSS for DLA, and knows soldering irons are not a health or safety hazard. Neither Mr. Card nor Ms. Cole ever disciplined Plaintiff or so much as ever spoke to her about the "soldering iron" incident regarding the safety of its use. Just as the Plaintiff predicted that K. Gaston seized upon that harmless non-incident and used it as a way to "get her in trouble." In January of 2020, Plaintiff went to both Mr. Card and Mrs. Cole to report harassment and hostile work environment by K.G. In discussions with Mrs. Cole, Plaintiff expressed to Mrs. Cole that she could no longer work in the office and that she would be moving in to the spare parts cage, 16 feet from her office to escape the unacceptable behavior of K.G. Mrs. Cole agreed to the move but, made no other effort to help rectify the situation. Mr. Card and Mrs. Cole left Plaintiff in the cage until the 2020 Covid epidemic and were sent to work from home in March 2020. March 2020 Plaintiff was sent home with her government laptop computer and supervision then activated the weather and safety classification so that she could continue to get paid. The weather and safety classification lasted March 2020 - August 2020 in August 2020, Jessica Cole notified

Plaintiff that they were no longer able to give the weather and safety leave. DLA Aviation could n ot justify allowing her to sit at home, do nothing and still get paid. Plaintiff would be put on indefinite suspension pending the outcome of the appeal for Plaintiff's security clearance. January 2021, Defense Office of Hearings and Appeals Administrative Judge (AJ) heard Plaintiff's case and reviewed the evidence presented, and proceeded to tell Plaintiff that there was no reason for the clearance revocation and Plaintiff had made sufficient steps to clear the debt and that this case should have never been forwarded to the DOHAA. The AJ told Plaintiff that he would recommend to overturn the CAFs decision to the PSAB. On June 29, 2021, the PSAB met and decided to overturn the CAF decision to deny Plaintiff's eligibility for access to classified information and/or occupancy of a national security sensitive position. The PSAB concurred with the recommendation of the AJ therefore, the PSAB granted Plaintiff eligibility to access classified information and/or eligibility for occupancy of national security sensitive position.

**PLAINTIFF RETURNS TO WORK UNDER DISPARATE CONDITIONS**

32. On July 26, 2021 Plaintiff's supervisor Mr. Cole reclassified Plaintiff as a new employee, told the Plaintiff she could not work remotely, removed her ability to work an alternative work schedule, and caused a high level of anxiety. Mr. Card informed the Plaintiff on that same day, "we have to do training because of you."

33. Plaintiff was contacted by Mitchell Card on or about July 23, 2021 to go over her return to duty. During Plaintiff's conversation with Mr. Card on July 23,

2021, he told Plaintiff she would report to her old office in Building 3907 and that he was suspending her "Gliding Alternate Work Schedule." Plaintiff told him she was not happy about that and felt that she was being punished again for winning her charge of discrimination against DLA. Plaintiff had been allowed to utilize the flexible scheduling plan before her revocation of her security clearance and employee suspension.

34. Upon Ms. Chavez's return to at DLA on or about July 26, 2021, her new 1st line Supervisor, Jessica Cole, reclassified Plaintiff as a "new employee" despite Ms. Chave's 15-year work history with DLA and over 11 years working in the immediate office. Ms. Cole's stated reason was because she "had never worked with Ms. Chavez." Ms. Cole further removed Ms. Chavez's eligibility to work the alternate work schedule which all other employees enjoyed, and in which she was allowed to participate before her wrongful placement on "indefinite suspension." Ms. Cole attempted to force Ms. Chavez to return to work in person during the Covid-19 pandemic, despite the Agency's clear knowledge that Ms. Chavez was at high risk for Covid-19 because she suffers from lupus and rheumatoid arthritis. Ms. Cole's decision was overturned after Ms. Chavez complained, about the danger to her health, but it was too late to avoid Ms. Chavez's panic over the decision. Plaintiff was on a phone call with Mitchell Card discussing her reentry plan, when the issue of K. Gaston and the EEOC ruling came up. They were discussing actions that DLA was mandated to take that's when Mitchell Card complained to Ms. Chavez that "we have to do training because of you." When

Plaintiff returned to work, despite the EEOC/OFO ruling, Mitchell Card immediately required Plaintiff to work in the same group with her tormenter, Kathy Gaston, who had continued to harass her and about whom she complained in writing on several occasions. Plaintiff raised her concerns about not moving K. Gaston from her office and felt it was best to move her before we go back into the office. The appeal to M. Card fell on deaf ears where he heartlessly said, "You're working remotely so what difference does it make?" You have no interaction with her at that time. This response from her supervision, regarding K. Gaston's torment, showed that once again she would receive no relief from supervision.

35. Mithcell Card retired, October 2021 while still under Covid restrictions for telework and for outdoor gatherings, the agency used COVID protocols to organize an outdoor retirement party.

36. Plaintiff hoped she could give a proper farewell to her boss whom, she did like personally and for the most part, enjoyed the working relationship with M. Card. Plaintiff had no joy for M. Card for the way he had handled her turmoil with K. Gaston. M. Card was the only supervisor she had who had actual knowledge about the process of her job and that she had learned from. M. Card had a retirement party that was off site at a city park. Plaintiff learned from Cynthia King that Gaston would be going to the party via Microsoft Teams application to message. Ms. Kings sent Plaintiff an IM inquiring if she was going to the party for M. Card. Ms. Kings' inquiry put Plaintiff on alert when she felt that it was possible K. Gaston had instructed Ms. King to ask if

Plaintiff would be attending the party. Plaintiff believed the reason she was asked about her attendance to the party, was directed by K. Gaston feeling negatively about Plaintiffs presence at the party. Plaintiff became anxious and decided to bring her son Kolby with her for support and safety because she no longer felt safe or comfortable going alone. It was Plaintiff's son Kolby who alerted her that "some lady" was giving us aggressive stares._ Kolby then asked her who the lady was that was staring, he had no memory of Ms. Gaston's physical appearance, and did not know who K. Gaston was until Plaintiff told him.

37. Plaintiff has been clinically diagnosed with PTSD as a result of the actions of Ms. Gaston, others at DLA, and the hostile environment she and the DLA supervisors created and fostered. The thought of being in the presence of Ms. Gaston in any way brought on severe panic and anxiety attacks, which are physically and mentally debilitating. DLA's attempt to minimize the effect of Gaston's actions at Mitchell Card's going away celebration demonstrate just exactly how retaliatory DLA has been in failing to address the mandates in the EEOC's June 9, 2021 decision on reconsideration. Plaintiff reported aggressive action toward her to supervision. On October 19, 2021, Plaintiff sent an email to COL. Jason Kalin at Tinker Air Force Base informing him of Gaston's ongoing behavior and DLA's refusal to stop the hostile work environment and harassment. In Plaintiff's email, she informed COL Kalin of her therapist diagnosing her with PTSD from having to work in a hostile work environment for a prolonged period of time. She asked COL. Kalin to please step in, to be the one

to protect her, and who eventually does the right thing. Plaintiff received no response until four months later. COL Kalin failed to start the process of investigating Plaintiff's complaint. COL Kaylin had knowledge of the EEOC ruling and that supervision and K. Gaston were responsible for harassment, etc. Plaintiff met with COL Kalin and she brought the ruling with her to show him. COL Kalin did not respond to Plaintiff's pleas for help and did not follow up with an email until almost four months later. Col Kalin no solutions for relief for her to have a safe working environment, COL Kalin responded, stating he had no ability to help her out, and suggesting that Plaintiff "bring it to [her] chain of command, so it can be promptly investigated and appropriately addressed." Plaintiff did in fact follow her chain of command when reporting this incident. COL Kalin was the last person in her command that she could report the deplorable actions at the retirement party to. On October 29, 2021, Plaintiff sent Carl Eggleston an email again seeking help with the hostile work environment she was being exposed to. As with COL. Kalin, Plaintiff informed Mr. Eggleston of Plaintiff's therapist diagnosing her with PTSD from having to work with Gaston for so long in an aggressive environment where no one would take action to protect Plaintiff. Eggleston and Plaintiff had a working relationship when they both worked at DLA Distribution with Eggleston as her supervisor. They previously worked well together at DLA Distribution and she hoped he would not force Plaintiff to work with Kathy Gaston any longer. Plaintiff received no response from Carl Eggleston. Unfortunately, as is often the case in retaliation cases, Plaintiff's "chain of command" was populated

by persons directly implicated in the hostile working environment, who were not disciplined, and were thus, emboldened to continue their efforts against the Plaintiff.

**PLAINTIFF FILES THIRD EEOC COMPLAIN DLA-22-0029**

38. Feeling Plaintiff had done everything in her power to stop this unfair and traumatizing situation at DLA, on November 5, 2021, Plaintiff instituted yet another charge against DLA, this time for retaliation, filing and prevailing in the Protected Activity Charge. January 2022 - May 2022, Plaintiff worked a hybrid telework status. Plaintiff was allowed to telework on the days that K. Gaston was in the office and she would come to the office when K. Gaston was teleworking. May 19, 2022, Plaintiff's son Kolby Dutton was killed, in a motorcycle accident. Kolby was heading to his job, at a motorcycle store in the maintenance and repair shop, that he absolutely loved when a driver DUI on multiple pain medications pulled out in front of him killing him instantly. Plaintiff reported the death of her child to Mrs. Cole immediately and that she would not be returning to work for a while and to start her bereavement leave. Plaintiff's bereavement leave took place May 19, 2022 through August 18, 2022. Due to the death of Plaintiff's son on May 19, 2022, there was a significant decline in her mental health and status. Mr. Cole reported to the Plaintiff that she was required to return to the office August 18, 2022. Plaintiff asked Mrs. Cole to not exacerbate her stress by having her work in the office with K. Gaston. She begged Mrs. Cole not to put her again in that harmful environment as it would result in further harm to her mental and physical health; Mrs. Cole denied the request. Plaintiff was told that she

was to report to her duty station for her shift. The dismissal from supervision regarding Plaintiff's mental and physical health, exacerbated her trauma, stress, PTSD, anxiety and panic attacks leaving her in a depraved state. The Plaintiff's depraved state that was born from the loss of her son and DLA's treatment leaving her feeling unprotected, vulnerable, hopeless, helpless, and weak. Without the safety from supervision, and supervision forcing Plaintiff to return to work in a harmful environment became unbearable for her to comprehend. Plaintiff had correspondence with Mrs. Cole trying to come up with a solution so she could come back to work in a safe environment. On December 7, 2022, Mrs. Cole sent a LOL (letter of Instruction) dated November 30, 2022, directing Plaintiff to report for duty on December 8, 2022, (1) ordered Plaintiff to report for duty on December 8, 2022 and (2) to continue to report for duty thereafter on a regular, fulltime basis. (3) threatened Plaintiff with removal from the Federal Service if she continued to be on leave; (4) referred Plaintiff to DLA's EAP, and (5) suggested Plaintiff seek a reasonable accommodation based on disability, providing the relevant contact at DLA for doing so. After the loss of Plaintiff's son, she was on a bereavement leave of absence (FMLA), the basis for which was documented by correspondence from her mental health professionals detailing two basis for her leave of absence; (a) anxiety and trauma related to the hostile work environment she had suffered at DLA and (b) emotional trauma and depression related to the loss of Plaintiff's son. The letter also recommended that she be "removed from the work area of Ms. Gaston, or that Ms. Gaston be removed." December of 2022, one of the

Plaintiff's health care givers submitted a diagnosis recommending that Plaintiff not be moved from her work station for 12 months due to needing stability in her life because life at home was not stable due to the loss of Kolby. Supervision ignored the December 2022 orders from Plaintiff's doctors and the EEOC decision regarding the ability to be in the presence of K. Gaston. Supervision continued moving forward with the torment by forcing her to work with K. Gaston displaying a gross abuse of power.

39. Accordingly, on December 7, 2022, Plaintiff made a request to DLA for a reasonable accommodation so she could continue to perform her duties at DLA while enjoying equal employment opportunities, including; (1) assurance that she not be required to work with, in the same building or office with, near or in proximity to Kathy Gaston; (2) requesting that she be allowed to telecommute, that she did with great success during the recent lockdowns due to the dangers presented by Covid; or (3) be allowed additional leave without fear of reprisal, as a reasonable accommodation under the ADA as is often granted for an employee Following exhaustion of her FMLA leave. Plaintiff attached the necessary medical information in accordance with Mrs. Coles request. On December 14, 2022, Jessica Cole offered Plaintiff an "interim accommodation" pending the processing of her long-term accommodation request, which would likely "take some time." The interim accommodation would last through Sunday, January 22, 2022 and would allow Plaintiff to telecommute from home Monday-Thursday, and to work in the office on Fridays, a day on which Gaston teleworks. On December 15, 2022, Plaintiff's prior attorney responded to Ms. Cole,

requestion an assurance that her work would be limited to certain area over which Gaston exercised no control or authority and asking that she be allowed to telecommute until (1) a conclusion of the matters related to the hostile work environment or (2) a permanent accommodation could be reached. Ms. Cole responded on December 16, 2022 that all was required was the interim accommodation proposed and requesting to know if there is a "specific medical reason why the 4-day telework offered" was inadequate when the office including Plaintiff had teleworked for a year without issues. On December 21, 2022, Plaintiff's counsel responded with an additional medical letter to her supervision. On December 22, 2022 counsel for DLA, Daniel Moebs, responded, disputing that the December 20, 2022 medical letter provides a basis for continuing telework. Mr. Moebs reinstated the interim accommodation, including a provision that it would not end until resolution of Plaintiff's request for long term reasonable accommodations. When Plaintiff returned to work in the winter of 2022, she had been reclassified as a" new employee" at DLA after more than fifteen years of working there. Without waiving her right to provide additional medical information demonstrating the interim accommodation is not "reasonable" under the circumstances, on December 27, 2022, Plaintiff's former attorney informed Mr. Moebs that agreed that Plaintiff would report to work at DLA as requested and would follow the schedule provided. Unfortunately, she alerted supervision that her_return to work was delayed because she was diagnosed with Covid. When Plaintiff returned to duty in December, 2022, Plaintiff logged in her computer looking for her emails that were no longer there.

Emails that were important to her retaliation case. Plaintiff called IT to inquire about the loss of her emails; Jeff Spencer informed her that her account was deleted due to being relieved of duties and her account was deleted including all history and emails associated with previous EEOC activity. There were pertinent files that held evidence for Plaintiff's EEO case which were tied to the [previous] account. Plaintiff then informed Jeff Spencer that she "was gone for almost a year on temporary suspension due to the loss of her security clearance with possibility of being permanently relieved of duty but her account was not deactivated then so why now? Plaintiff told him that it was imperative that she get that email account recovered. Classifying her as a "new employee" is evident that they tried to cover up the fact that they had already begun to delete her from the DLA database in anticipation of her removal. At 1:30 on Friday before MLK day, Plaintiff noted her coworkers leaving for the day and had to ask if the employees got an hour leave for the holiday, to which her colleagues replied they did. Plaintiff was not notified of the hour, despite having met with her supervisors that day to discuss time sheets and coding. On January 19, 2023, Plaintiff learned of a training session to occur on January 27, 2023, at which all personnel were to be present, including Kathy Gaston. In response, Plaintiff asked the organizer three times if the training would be in person. When he finally responded, he told her he "would make arrangements for [her], maybe to attend the training virtually or schedule separate training for" her. Why must Plaintiff be isolated from the group training instead of Kathy Gaston, the person responsible for the problem in the first place? At about the

same time in January of 2023, DLA changed the location of Plaintiff's workspace. Despite having reported previously ongoing harassment by Gaston to her supervisors, asking supervision on January 19, 2023 to be located to the "cage" where Plaintiff had previously worked prior to Covid leave, as an accommodation pending a decision on her request for a reasonable accommodation, Jessica Cole's denied the request directing Plaintiff to return to a "bull pen" atmosphere where employees are separated by cubicle walls that are no more than four feet tall. In February of 2023, Monica Warren, the ADA representative asked for additional medical documentation from her physician, which Plaintiff provided. On February 23, 2023, she followed up with Monica Warren and learned the information she had provided was not given to her, so she sent it again. On March 8, 2023, Plaintiff provided Monica Warren with two emails she received concerning work-related events she was required to attend with Kathy Gaston. She explained that the last training, she was the person excluded from the event to attend remotely, which was entirely unfair and Plaintiff never got to go to the training. On March 28, 2023, Plaintiff received a letter of reprimand from DLA for "Conduct Unbecoming a Federal Employee": from Matthew Flores. The program Enterprise Data Warehouse access is one program needed to perform 80% of the duties a CCS performs she could not access. Plaintiff had notified. Mr. Flores the week prior to March 13, 2023 that at that point in time still could not get into said program. His response was, "It's a program that just takes a long time to process." He couldn't do anything to expedite your request. You just have to wait it out. On March 13, 2023, Plaintiff

reported to Matthew Flores she was unable to log on to Enterprise Data Warehouse first thing that morning, she notified M. Flores that she still could not get into the program. He then ordered that she call IT to request the status of the request. She agreed to call IT and report the problem. Having suffered major trauma from DLA mistreatment and the gut-wrenching loss of her son, she now suffers from extreme anxiety. Plaintiff's extreme anxiety was triggered when she waited more than 20 minutes for someone to answer. To relieve her anxiety from the continued wait time holding for the next representative to answer the phone, the music on the wait line suggested that if the wait time is too long, please submit a help ticket on the IT website. She chose to submit a help ticket through the online process. Ms. Flores then IM'd her using the DLA approved messaging system to check the status of the call to IT. She responded to Mr. Flores through the same messaging app, informing him that she submitted a ticket instead of waiting on the physical call. He responded by asking for the ticket number from the help ticket. Supervision automatically received an email notification whenever an employee submits a help ticket. When she asked him, Why? Because Mr. Flores just 3 working days ago said that he couldn't do anything to expedite the approval. Due to Plaintiff's past experience with the bullying, hostile work environment from supervision, she felt the malevolent treatment created by DLA supervision since 2010 was still an active, she felt uneasy about the question because it made her feel the way she felt from previous supervision during the 2012 EEO. She felt M. Flores was instructed to engage in tormenting treatment she experienced from past supervision. In

the 13 years of being an item manager, she never had been directed by supervision to give them a ticket number when a help ticket was submitted by phone or online. His intimidation was used to question the validity if the Plaintiff did in fact submit the ticket, is ridiculous. Her trustworthiness was something he had no experience with nor has he ever worked with Plaintiff. His hostility when requesting the ticket number was upsetting to her for many factors; she had never given him any reason to question the ability to perform her job duties. Why did he? The Plaintiff had continued to keep M. Flores updated on all tasks completed prior to the insubordination claim. She then asked M. Flores why did he need the ticket number? What could he do for me today that he couldn't when I called the week prior? He never answered the Plaintiff's question, which enhanced the negative feelings she felt toward supervision especially from M. Flores. The next morning, the Plaintiff submitted to his request and emailed Mr. Flores the ticket number. Because she did not give Mr. Flores the ticket number when he requested, that he was already in possession of, he saw this to be failure to comply to his request and was a violation of a direct order. Mr. Flores sent the Conduct Unbecoming a Federal Employee, a very serious charge, for not giving ticket number upon his request.

40. The Plaintiff had no negative remarks in her file that supported Mr. Flores' excessive and ridiculous charge. Plaintiff attempted to resolve and speak on her behalf against the write up at the lowest level when Mr. Flores denied my union request to meet and discuss the reprimand. In the 15+ years as a federal employee, with experience

of handling employment issues with the help of the union, his denial to meet with Plaintiff to discuss the charge of Conduct Unbecoming a Federal Employee was an action taken by a supervisor that had never been done. Plaintiff was denied any explanation for the harsh charge of Conduct Unbecoming a Federal Employee, and the punishment that came with the charge. Mr. Flores must have had some sort of fear of complaint when he chose to email the write up not and not in person. Supervision manipulated the presentation of the write up so that Plaintiff would not be able to question the charge in person. Plaintiff did not feel safe following the chain of command to resolve the issue due to it was her Chain of Command were the ones who issued the ridiculous charge, she had nowhere to go for help. Her desperation for to have a safe work place without the torment left her with no more avenues to approach for help. Plaintiff did not give up trying to fight the ridiculous charge.

**PLAINTIFF'S COMPLAINT TO DLA AVIATION COMMANDER**

41. On October 19, 2021, while still in a fulltime telework status, Plaintiff emailed the DLA Aviation Commander COL Jason Kalin concerning continuing discrimination and harassment. Plaintiff's meeting with HR and COL Kaylin was a waste of her time.

42. The reprimand of Conduct Unbecoming a Federal Employee was baseless and retaliatory. HR did not allow her to talk about the charge with the COL Kaling because it was an ongoing case. She was unable to get an answer from the COL or HR Cate Boyles the reason for the heavy charge and punishment; they did not give an

explanation for charge or to remedy Plaintiff's unsafe environment situation. The charge is current on her employee record and was denied the opportunity to challenge the charge After DLA provided no assistance whatsoever in the area of a "reasonable accommodation," DLA ultimately forced Plaintiff to go back to work in bullpen atmosphere at a desk next to Gastons's.

**PLAINTIFF'S MEDICAL DIAGNOSIS OF DISABILITY**

43. When she arrived to 3907 to report for duty, as she approached the office entry door, she heard K. Gaston's voice, it triggered her PTSD that K. Gaston is responsible for. K. Gaston's voice triggered a severe panic attack in front of her office. Plaintiff began crying NO, NO, NO, NO as she fell to the ground, hiding under the table. Plaintiff lost consciousness, medical personnel had to be called. She was in distress when medical personnel arrived. Medics took her blood pressure it was 180/130, medical personnel were concerned her health and the possibility of having a stroke. Plaintiff 's wife was called to the scene to help her since she was obviously having a health problem. There should be a call report the medics did after the call. Supervision allowed her to take leave the next day (Wednesday) to recoup and report on site Thursday and Friday when K. Gaston is scheduled for telework. On Friday at the end of shift, she asked Matt Flores, what her week looked like next week to which he replied, "in here (as he pointed to my desk). She then asked him if he was aware of the medical distress and trauma that I suffered due to having my PTSD triggered by being forced to work with someone that obviously puts her in physical and mental

distress like it did on Tuesday. He said "Yes I am and I cannot do anything due to not having sufficient medical documentation stating you cannot work near K. Gaston." Plaintiff then asked if he had any ideas that did not include moving the Plaintiff in order to have a safe and healthy working environment? His response was, "I got nothing, report to this office on Monday."

44. The lack of any kind of protection from any level of supervision, chief of staff Eugene Kempt, or enlisted leadership, put Plaintiff in a delicate mental state that she endured as long as she could. The trauma became so overwhelming that she was eventually forced to seek serious psychological treatment when she failed to protect herself. Plaintiff had done everything and took every avenue possible to come to work just not in the harmful environment. After her last interaction with M Flores when he told her that she was to report to the office that K. Gaston was in even after the medical episode she had. The Plaintiff was left defeated, broken, and unworthy as a result of the trauma, and torment from her supervision. She no longer could perform self-care, she wasn't showering, she wasn't brushing her teeth, not changing her clothes and not eating. Plaintiff was headed to a depression that people don't come back from. She admitted herself to a mental health facility. Plaintiff provided documentation to DLA from my doctor dated May 5, 2023, and requesting that she be excused from work from April 17, 2023 through May 12, 2023 for mental health care. Plaintiff was admitted in Oakwood Springs outpatient treatment. The treating doctor recorded that her "anxiety and depression started in 2012 when she was being harassed by a coworker."

The doctor recorded that her coworkers and supervision created a "hostile work environment since 2010", It is and also noted that her depression worsened after the death of her son in 2022. Her outpatient treatment was extended because she still exhibited signs of stress, depression, of severe mental health issues. When extension time was over, and she was discharged from Oakwood Mental Health Facility on June 19, 2023. Keeping the communication open with supervision, she notified M. Flores the date that she would be able to return to duty. After two back-to-back outpatient completed programs with Oakwood Mental Health Facility, she submitted her diagnosis from Oakwood to her supervision. Presenting supervision with proper documentation that K. Gaston did in fact traumatize her, supervision ignored doctors' diagnosis, forcing her to work in the presence of K. Gaston.

**PLAINTIFF FILES THIRD EEOC COMPLAINT DLA-22-0029**

45. On November 5, 2021 Plaintiff again contacted EEOC counselor and made claims that she was subjected to harassment (hostile work environment) and discrimination based on sex and retaliation based on prior EEOC activity. Plaintiff's Complaint was given DLA-22-0029.

46. On January 31, 2022 Plaintiff filed a Formal Complaint of Discrimination. On March 3, 2022 Plaintiff was informed that some issues she had raised were accepted for investigation in DLA-22-0029.

**CONTINUED HARASSMENT**

47. On April 11, 2022 Plaintiff emailed Corey Edwards, her new supervisor and unit chief. She informed Mr. Edwards of her prior EEO action where Plaintiff prevailed for discrimination and hostile work environment. Plaintiff reported to Mr. Edwards that Ms. Gaston continued to harass her and Plaintiff had to move the office to get away from her before the office began teleworking. Plaintiff advised Mr. Edwards of additional facts and circumstances to support her claim.

**PLAINTIFF'S SON KILLED IN MOTOR VEHICLE ACCIDENT**

48. On May 19, 2022 Plaintiff's 17-year-old son, Kolby, was tragically killed in a motor vehicle accident. This was a life-changing event in the Plaintiff's life and understandably it took a profound toll on her health and overall wellbeing.

**PLAINTIFF PHYSICIAN ISSUES DIAGNOSTIC LETTER**

49. On August 24, 2022 Dr. Woodward drafted a Diagnostic Letter regarding the Plaintiff. Dr. Woodward indicated Plaintiff met the criteria for a person in a State of Emotional Shock and Stress in addition to Adjustment Disorder with Mixed Anxiety and Depressed Mood. Dr. Woodward recommended that Plaintiff be removed from "the work area of Gaston, or that she be removed."

**AGENCY ISSUES LETTER OF INSTRUCTION TO PLAINTIFF**

50. On November 30, 2022 Mr. Cole issued Plaintiff a Letter of Instruction regarding absences.

**PLAINTIFF REPLY TO LETTER OF INSTRUCTION**

51. On December 8, 2022 Plaintiff responded to the Letter of Instruction. Subsequently Plaintiff's attorney exchanged letters with Mrs. Cole, but no resolution was reached.

**PLAINTIFF ASKS WHY?**

52. On or around March 7, 2023 Plaintiff began reporting an inability to log into the computer systems needed to perform her duties. Plaintiff had already called IT and created a ticket. When Matthew Flores asked for the ticket number Plaintiff inquired why he wanted it? Plaintiff stated she was a 13-year DLA employee. And she reminded Mr. Flores he already had a copy of the ticket because a copy goes to supervisor when the ticket is turned in. But Mr. Flores said it was within his authority to again request it from the Plaintiff and he used his workplace authority to unnecessarily bully the Plaintiff in that manner.

**PLAINTIFF ISSUED A LETTER OF REPRIMAND**

53. Mr. Flores continued to bully the Plaintiff when on March 28, 2023 Mr. Flores issued Plaintiff a Letter of Reprimand for Conduct Unbecoming a Federal Employee. On March 31, 2023 Plaintiff sent an email to Mr. Flores advising that the Plaintiff was being subjected to unwarranted mistreatment and being informally harassed and bullied. The Plaintiff sought assistance from her union but Mr. Flores refused to meet with the Plaintiff or with the union.

**MR. COLE GRANTED PLAINTIFF ONLY LIMITED ACCOMMODATIONS**

54. On March 31, 2023 Mr. Cole granted the Plaintiff only limited reasonable accommodations that did not fully address her medical disability.

**MRS COLE REVISED PLAINTIFF'S PARTIAL ACCOMMODATIONS**

55. On April 7, 2023 Dr. Sandbothe updated Plaintiff's medical documentation and detailed the frequency of Plaintiff's "episodic flare-ups", the symptoms of the "episodic flare-ups," and whether an "episodic flare-up" would pose a safety risk in the workplace.

56. Based on Dr. Sandbothe's updated diagnosis, Mr. Cole again revised and limited Plaintiff's reasonable accommodation.

**PLAINTIFF SUFFERS WORKPLACE TRAUMA ON APRIL 11, 2023**

57. On April 11, 2023 Plaintiff was traumatized upon entering her work area. Because of her condition supervisors called for an ambulance. The Plaintiff's episode began before Ms. Gaston walked past the area to go to the lady's room.

**MAY 5, 2023 DR. SANDBOTHE PROVIDES ADDITIONAL MEDICAL EVIDENCE**

58. By letter dated May 5, 2023 Dr. Sandbothe advised that Plaintiff was under care for treatment of depression and anxiety. On May 9, 2-23 Plaintiff was admitted to an intensive outpatient program. The Plaintiff's condition continued to medically deteriorate.

## PLAINTIFF PLACED ON INPATIENT TREATMENT

59. On July 3, 2023 Plaintiff was admitted to inpatient treatment due to decline in function and increasing depression. The basis of that depression was the Agency's continually creation and enhancement of a hostile work environment imposed on the Plaintiff.

60. On July 5, 2023 Plaintiff was admitted to Oakwood Springs Inpatient Facility. Thereafter Plaintiff was admitted for outpatient services to "step down" from inpatient treatment.

## PLAINTIFF REMOVED OCTOBER 26, 2023

61. On October 26, 2023 Plaintiff was removed from her position of Inventory Management Specialist. That removal was without evidentiary basis.

## FIRST CAUSE OF ACTION--REVERSAL OF MSPB FINAL ORDER

62. The Plaintiff incorporates by reference as if fully set out herein all the facts, evidence and circumstances set forth in paragraphs 1 through 61, inclusive.

63. That the evidence reveals that the Initial Decision handed down by Administrative Judge Chizoma O. Ihekere on August 28, 2026 that became final on October 2, 2026 is in legal error as a judgment contrary to the extensive evidence of discrimination against the Plaintiff based on gender, female, sexual orientation and physical disability.

64. The evidence presented below did not support the finding that removal of the Plaintiff was supported by a preponderance of evidence, 5 U.S.C. §7701(c)(1)(B).

65. The Agency did not establish the factual basis and legal elements of the charges made against the Plaintiff.

66. The Agency did not establish a nexus between the charged conduct and the efficiency of the service.

67. The Agency did not establish the reasonableness of the selected penalty, 5 U.S.C. §7513(a).

68. The Plaintiff provided a preponderance of evidence to show the Agency action against her was based upon prohibited personnel practices of discrimination based on gender (female), sexual orientation, and physical disability, 5 U.S.C. §7701.

69. The evidence in the record did not support the Administrative Judge's finding that the charge of Plaintiff's excessive approved absences was established.

70. The evidence in the record does not support the Administrative Judge's finding that the charge that the Plaintiff was able was established.

71. The evidence in the record does not support the Administrative Judge's finding that the charge of Plaintiff's failure to follow proper leave procedures was established.

72. The evidence in the record does not support the Administrative Judge's finding that Plaintiff's failure or delay in following instructions was established.

73. The Administrative Judge's finding that the Plaintiff failed to prove her claim of disability discrimination was contrary to evidence.

74. The Administrative Judge's finding that the Plaintiff failed to prove her claims of retaliation for engaging in protected activity was contrary to the evidence.

75. The evidence in the record did not support the Administrative Judge's finding that there was a nexus between the Plaintiff's conduct and the efficiency of the service.

76. The evidence in the record did not support the Administrative Judge's finding that the penalty imposed against the Plaintiff did not exceed the bounds of reasonableness.

WHEREFORE, based on the legal authority and evidence set forth in the administrative record the Final Order of the Administrative Judge should be REVERSED and the Plaintiff should be reinstated to her former position of employment with all back pay and benefits, and with payment for her attorney fees and litigation costs, and such other and further relief as the Court may grant.

Respectfully submitted,

*/s/ Daniel J. Gamino*

DANIEL J. GAMINO OBA #3227
Daniel J. Gamino & Associates, P.C.
3035 NW 63rd Street, Suite 214
Oklahoma City, OK 73116
Phone: (405) 840-3741/Fax: (405) 840-3744
Email: danieljgaminopc@gmail.com
*Attorney for Plaintiff Kathy Chavez*

*Verification attached.*

# VERIFICATION

STATE OF OKLAHOMA )
) ss.
COUNTY OF OKLAHOMA )

I, KATHY CHAVEZ, being of lawful age and first duly sworn upon oath, do hereby depose and state:

That I have read the above and foregoing instrument and know the contents thereof to be true and correct to the best of my knowledge and belief.

[signature]
KATHY CHAVEZ

Subscribed and sworn to before me this 28th day of October, 2026.

[signature]
NOTARY PUBLIC

My Commission expires:

DIANA BECK
NOTARY PUBLIC
STATE OF OKLAHOMA
NOTARY SEAL PUBLIC
Commission # 04003306 Expires 03/14/28